## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, David S. Clements, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant for information associated with account identifier benjamincamerondavis@gmail.com that is stored at premises owned, maintained, controlled, or operated by Google, LLC, an electronic communications service and remote computing service provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.    I am a Task Force Officer with the Drug Enforcement Administration (DEA), currently assigned to the Roanoke, Virginia, Resident Office Tactical Diversion Squad (TDS) in the Washington Field Division.  As a duly appointed Task Force Officer in the DEA, I am charged with the duty of enforcing the Controlled Substances Act, and am authorized under Title 21, United States Code, Section 878 to carry firearms, execute warrants, make arrests for offenses against the United States of America, and to perform other law enforcement duties as authorized by law.

3.    I have been a sworn Law Enforcement Officer for approximately ten years and assigned to various investigative positions over the past eight years. Since August 2016, I have

been a member of DEA's TDS Group 26 and have participated in numerous drug investigations that have included physical and electronic surveillance, execution of search and arrest warrants, evidence handling, undercover operations, control and administration of confidential sources, domestic drug distribution organizations, and the arrest and subsequent prosecution of numerous drug traffickers. I have also spoken on numerous occasions with informants, suspects, and experienced drug investigators concerning the manner and means that drug traffickers use to further the operations of their drug trafficking organizations and the most effective methods for investigating and dismantling drug trafficking organizations. I have completed a six month basic law enforcement academy and also attended various trainings related to both illicit and diversion drug investigation and prosecution. In the past, I have obtained and executed search warrants through the Virginia Judicial System on corporations that provide electronic communication services or remote computing services, specifically Google, LLC.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause, based on information contained in this affidavit, to believe that violations of the federal drug laws, specifically Title 21, United States Code, Sections 846 and 841(a)(1), and Title 21, United States Code, Section 843(a)(3), have been committed by Benjamin Cameron DAVIS. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

2

**JURISDICTION**

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

BACKGROUND

7.     DAVIS was previously registered with the DEA as a Practitioner with the authority to handle (to include prescribe, order, and/or administer) controlled substances in Schedules 2, 2N, 3, 3N, 4, and 5 under DEA Registration Number FD0960903, originally issued July 22, 2008, with a registered address of Carilion Clinic, 1906 Belleview Avenue, Roanoke, Virginia.  On May 21, 2020, DAVIS voluntarily surrendered his DEA Registration as a result of this investigation. The surrender was processed on May 22, 2020.

8.     DAVIS is a licensed physician with a listed medical license expiration date of December 31, 2020. Open source database checks indicate that DAVIS operates as a wound care physician for Carilion Clinic at the following locations: 101 Elm Avenue, Roanoke, Virginia; 2900 Lamb Circle, Christiansburg, Virginia; and 1906 Belleview Avenue, Roanoke, Virginia.

9.     As used in this affidavit and pursuant to Title 21, C.F.R., Section 1300.01, the term "prescription" is an order for medication dispensed to or for an ultimate user, but does not include an order for medication that is dispensed for immediate administration to the ultimate user. Title 21, C.F.R., Section 1306.04(a), provides as follows:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and

3

dispensing of controlled substances is imposed primarily on the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. § 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

10.     In addition, an order purporting to be a prescription that was not issued in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Act (21 U.S.C. § 829). Any person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

CASE INITIATION

11.     In or around April 2020, a source of information (SOI) notified a Montgomery County Deputy Sheriff that DAVIS had prescribed oxycodone to Patient A, and then traveled to Patient A's residence to "confiscate" the medication for disposal purposes.

12.     Special Agent (SA) Joshua Rogers, Task Force Officer (TFO) Clark Jackson, and Montgomery County Sherriff's Office (MCSO) Deputy Jason Riggs conducted an interview of the SOI on April 29, 2020. The SOI, a physician, lives at the same residence with Patient A, his/her elderly parent. Patient A had been referred to DAVIS due to wounds on his/her legs.

13.     The SOI explained that on March 12, 2020, at approximately 11:30 AM, Patient A traveled to Carilion Clinic Wound Center in Christiansburg, Virginia, for his/her initial appointment. DAVIS prescribed Patient A 30 5mg oxycodone tablets, as well as a ketamine compound. Prior to being prescribed the opioids by DAVIS, Patient A was opioid naïve. The SOI

4

stated that Patient A attempted to ingest ½ of a 5mg oxycodone tablet prescribed by DAVIS but had an adverse reaction. Patient A no longer wanted to take the medication.

14.     Patient A cancelled a follow-up appointment with DAVIS scheduled for March 26, 2020, at 11:30 AM due to concerns about COVID-19 exposure. The SOI advised that upon cancelling that appointment, Patient A was told by someone in DAVIS' office that DAVIS would be willing to come to his/her residence for the follow-up appointment. DAVIS then called Patient A and advised that he needed to come to his/her residence in order to check his/her wounds, the recliner he/she was using to ensure it allowed for sufficient circulation and reduction of swelling, and the lymphatic pump.

15.     On March 29, 2020, the SOI sent an electronic message to DAVIS through Patient A's MyChart Message Center, expressing concerns about DAVIS coming to their shared residence to treat Patient A. During this correspondence and a subsequent telephone call, the SOI offered to take photographs of Patient A's wounds, the recliner, and lymphatic pump to send to DAVIS. DAVIS did not respond to the electronic message. The SOI then called DAVIS' office and cellphone at 540-204-6899 and again expressed concerns about DAVIS visiting the residence he/she shared with Patient A due to COVID-19. The SOI suggested a telemedicine visit.

16.     DAVIS then asked about the oxycodone he prescribed Patient A on March 12, 2020. The SOI told DAVIS that Patient A took approximately ½ of one of the prescribed oxycodone tablets, experienced an adverse reaction, and declined to take any additional oxycodone. Patient A had approximately twenty-nine (29) oxycodone tablets remaining. The SOI stated DAVIS advised he needed to "confiscate" the remaining oxycodone tablets for disposal purposes.

5

17.     Notwithstanding the SOI's request that DAVIS not visit the residence he/she shares with Patient A, DAVIS arrived at the residence on March 31, 2020, at approximately 2:59 PM. A camera at the front door captured the following image of DAVIS standing outside of the residence:



6

18.     Upon DAVIS' arrival at the residence, Patient A called the SOI, who advised Patient A to slightly open the front door and toss the pill bottle containing the remaining oxycodone onto the front porch. Patient A did so; DAVIS took the medication and left the residence.

19.     DAVIS later contacted Patient A, who asked about the oxycodone tablets. DAVIS stated he disposed of the oxycodone tablets properly.

### PRIOR DEPARTMENT OF HEALTH PROFESSIONS INVESTIGATION

20.     On May 1, 2020, SA Rogers issued Administrative Subpoena KR-20-592234 to Commonwealth of Virginia Department of Health Professions (VADHP) regarding previous investigations relating to DAVIS. On May 11, 2020, SA Rogers received the requested documents from VADHP.

21.     The information revealed that DAVIS previously suffered from an addiction to Ambien. According to the VADHP records, on October 14, 2011, DAVIS was transported to Roanoke Memorial Hospital Emergency Department exhibiting an altered mental status and seizure activity associated with withdrawal effects of previous long-term Ambien use.

22.     Based upon a review of the Virginia Prescription Monitoring Program, it was determined that DAVIS was receiving Ambien from multiple providers, including the reporting party.

23.     There was no disciplinary action related to this VADHP investigation.

### DATA OBTAINED FROM THE VIRGINIA PRESCRIPTION MONITORING PROGRAM

24.     During the course of this investigation, investigators obtained raw prescription data

from the Virginia Prescription Monitoring Program (PMP)[1] for controlled substances filled in

Virginia between April 2019 to April 2020. This data indicates that approximately 1,249 controlled

substance prescriptions were issued or authorized by DAVIS and filled in Virginia, totaling

approximately 51,519 dosage units.

25.    Between April of 2019 and April of 2020, DAVIS treated a total of 323 patients,

with an average age of 59. During this time period, DAVIS prescribed/authorized a total of 493

prescriptions for Schedule II medications resulting in the distribution of 18,873 dosage units.

DAVIS prescribed/authorized a total of 190 prescriptions for Schedule II medications

resulting in the distribution of 7,345 dosage units to patients approximately 60 years old to 85

years old.

26.    Mary Ann Hamilton and James Hamilton are two individuals listed in DAVIS'

PMP as having received Schedule II controlled substance prescriptions from DAVIS.  Through

the course of this investigation, your Affiant has identified Mary Ann and James Hamilton as

DAVIS' mother-in-law and father-in-law.[2]

---

[1] The Virginia Prescription Monitoring Program is a database maintained by the Virginia
Department of Health Professions and logs raw prescription data for controlled substances filled
in pharmacies in the Commonwealth of Virginia.  The data is subject to verification.
[2] The Virginia Administrative Code provides that a practitioner shall not prescribe a controlled
substance to a family member (other than a Schedule VI substance) unless the prescribing occurs
in an emergency situation or in isolated settings where there is no other qualified practitioner
available to the patient, or it is for a single episode of an acute illness through one prescribed
course of medication. When treating or prescribing for a family member, the practitioner shall
maintain a patient record documenting compliance with the statutory criteria for a bona fide
practitioner-patient relationship. 18 VAC 85-20-25.

ANALYSIS OF PMP DATA FOR MARY ANN HAMILTON
AND JAMES HAMILTON

27.     An analysis of raw prescription data obtained from the Virginia Prescription

Monitoring Program revealed that from approximately July 2018 to March 2020, DAVIS has

issued/authorized approximately 23 prescriptions for oxycodone to Mary Ann Hamilton,

resulting in the distribution of 1,090 dosage units.  In addition, from April 2019 to May 2020,

DAVIS issued/authorized approximately 17 prescriptions for oxycodone to James Hamilton

resulting in the distribution of 850 dosage units.

28.     James Hamilton's PMP reveals he received oxycodone prescriptions from his

oncologist, which were filled on May 25, 2018, August 2, 2018, and September 13, 2018.

Beginning April of 2019, DAVIS took over James Hamilton's oxycodone prescriptions, while

Mr. Hamilton continued to receive prescriptions for gabapentin from his oncologist during the

same time period, as reflected in the PMP data.

29.     Mary Ann Hamilton's PMP reveals DAVIS began writing oxycodone

prescriptions for her in July 2018. During the same time period, Ms. Hamilton was receiving

prescriptions from other physicians, as reflected in the PMP data.

SURVEILLANCE CONDUCTED ON MAY 11, 2020

30.     On May 11, 2020, SA Rogers and SA Charles Sanders conducted

periodic surveillance of DAVIS at Carilion Roanoke Community Hospital and residence of

DAVIS located in the vicinity 119 23rd Street SE, Roanoke, Virginia.

31.     At approximately 3:28 PM, SA Sanders observed a vehicle resembling DAVIS'

parked adjacent to his residence.

32.     At approximately 5:24 PM, SA Rogers received a telephone call from CVS

Pharmacist Jason Ohler located in the vicinity of 2001 Colonial Avenue, Roanoke, Virginia.[3] Mr. Ohler stated that at approximately 5:10 PM, Mary Ann Hamilton provided the pharmacy with a prescription for 50 5mg oxycodone tablets prescribed to James Hamilton by DAVIS. SA Rogers requested that Mr. Ohler not relinquish custody of the prescription until SA Rogers arrived. Mr. Ohler concurred and advised SA Rogers to speak with Pharmacist Tom Allen upon arrival.

33. At approximately 5:50 PM, SA Rogers and SA Sanders entered the CVS and spoke with Mr. Allen. Mr. Allen provided SA Rogers the prescription for Mr. Hamilton. SA Rogers photographed the prescription, which was written by DAVIS for James Hamilton on May 11, 2020, and provided for 50 5mg oxycodone tablets. Mr. Allen stated that Mary Ann Hamilton had presented the prescription and would return to retrieve the medication in approximately 10-15 minutes.

34. At approximately 6:02 PM, SA Rogers observed Ms. Hamilton wearing a light blue colored shirt and dark pants exit CVS and enter a red Dodge SUV bearing Virginia license plate VV4803. The National Crime Information Center revealed Virginia license plate VV4803 is registered to a 2014 Dodge, registered owners James Walter Hamilton and Mary Ann Hamilton with a listed address of in Roanoke, Virginia.

35. At approximately 6:04 PM, SA Rogers observed Mary Ann Hamilton depart the CVS.

---

[3] Based upon a review of raw data obtained from the Virginia Prescription Monitoring Program in regard to the prescribing of DAVIS to Mary Ann Hamilton and James Hamilton, your Affiant contacted the aforementioned CVS and requested that prior to filling any Schedule II prescriptions issued/authorized by DAVIS to Mary Ann Hamilton or James Hamilton that the pharmacist notify your Affiant.

36.     At approximately 6:07 PM, SA Rogers observed Mary Ann Hamilton arrive at the residence of DAVIS located in the vicinity of 119 23rd Street SE, Roanoke, Virginia, exit her vehicle and walk towards the rear of the residence. In addition, SA Rogers confirmed the vehicle previously observed by SA Sanders was DAVIS' Dodge bearing Virginia license plate AES5730. The National Crime Information Center revealed Virginia license plate AES5730 is registered to a 2004 Dodge, registered owner Benjamin Cameron DAVIS, with a listed address of 119 23rd Street SE, Roanoke, Virginia.

37.     Based on training and experience, as well as other facts revealed throughout the investigation as detailed below, your Affiant believes that Mary Ann Hamilton obtained oxycodone that was issued/authorized by DAVIS to James Hamilton for subsequent distribution to DAVIS.

SURVEILLANCE OF DAVIS ON MAY 21, 2020

38.     On May 21, 2020, your Affiant, SA Joshua Rogers, SA Sanders, TFO Lawrence Findley, and TFO Clark Jackson established surveillance at Carilion New River Valley Medical Center located in the vicinity of 2900 Lamb Circle, Christiansburg, Virginia.

39.     At approximately 12:05 PM, your Affiant observed DAVIS enter the driver's side of his registered Dodge pick-up.  Shortly thereafter, your Affiant observed DAVIS exit the parking lot and travel northbound on Interstate 81.

40.     At approximately, 1:00 PM, your Affiant observed DAVIS arrive at the residence of Patient B in New Castle, Virginia. Patient B was confirmed through PMP data to be DAVIS' patient.

41.     At approximately 1:17 PM, your Affiant observed DAVIS depart the residence of Patient B and travel to a Food Country USA located in the vicinity of 302 Market Street, New

11

Castle, Virginia. Market Street Pharmacy is also located within that Food Country USA. After observing DAVIS enter Food Country USA, TFO Findley contacted Market Street Pharmacist, Mike Fisher, to inquire about the prescribing habits of DAVIS. TFO Findley asked Mr. Fisher whether DAVIS had been in the pharmacy in the last thirty minutes, either filling a prescription for himself, or for Patient B. Mr. Fisher stated, to his knowledge, DAVIS had not been in the pharmacy in the past thirty minutes. TFO Findley told Mr. Fisher DAVIS had been seen going into the grocery store where the pharmacy is located.

42.     At the mention of Patient B, Mr. Fisher told TFO Findley that he had recently spoken with Patient B (who is related to Mr. Fisher) about a previous visit DAVIS made to his/her residence. Patient B told Mr. Fisher that DAVIS made a house call to his/her residence and looked at her medication, opening the pill bottles as if he was counting them. Once DAVIS left the residence, Patient B noticed some of his/her pills were missing. Mr. Fisher stated he told Patient B that DAVIS should not have counted his/her pills. Mr. Fisher gave Patient B a lock box to keep his/her medications secure.

43.     At the request of TFO Findley, Mr. Fisher called Patient B and asked if DAVIS had been at his/her residence recently. Patient B told Mr. Fisher that DAVIS had been there that day making a house call, but he did not look at his/her medication because they were in the lock box. Patient B stated, however, that DAVIS looked through his/her daughter's medication. Patient B thought that was strange.

44.     At approximately 1:25 PM, SA Rogers observed DAVIS exit Food Country USA and enter his Dodge. Shortly thereafter, SA Rogers observed DAVIS depart the parking lot and travel to Roanoke, Virginia.

12

45.    At approximately 2:11 PM, SA Rogers observed DAVIS arrive at the residence of Patient C in Roanoke, Virginia. Patient C was confirmed through PMP data to be DAVIS' patient. As detailed below, Patient C was subsequently interviewed on May 26, 2020.

46.    At approximately 2:22 PM, SA Rogers observed DAVIS depart the residence and stop to obtain food for hospital personnel.

47.    At approximately 2:52 PM, SA Rogers observed DAVIS arrive at Carilion Roanoke Community Hospital located in the vicinity of 101 Elm Avenue, Roanoke, Virginia. Shortly thereafter, your Affiant and SA Rogers made contact with DAVIS and requested that he accompany your Affiant and SA Rogers to the Drug Enforcement Administration Office for a voluntary interview, to which DAVIS agreed.

INTERVIEW OF DAVIS ON MAY 21, 2020

48.    On May 21, 2020, your Affiant and SA Rogers conducted an interview of DAVIS at the Drug Enforcement Administration Office located in Roanoke, Virginia. Your Affiant advised DAVIS that this interview was voluntary and that he was free to leave at any time. The following information was stated in substance and is not verbatim, and is intended to be a summary.

49.    SA Rogers asked DAVIS whether he currently had an opioid addiction. DAVIS admitted to an oxycodone dependency. DAVIS stated that he initially began taking opioid medications for insomnia as well as a bicep injury that occurred while playing lacrosse. Further, DAVIS admitted he previously had obtained Schedule II medications from his patients for personal ingestion; however, he denied having done so on the date of the interview. DAVIS claimed to have started obtaining opioid medications from patients in order to wean them to a lower quantity and dispose of the excess medication. DAVIS admitted he was not as diligent as he should have been

13

about noting in the patient files when he had retrieved a previously prescribed medication from a patient and/or disposed of it.

50.     With respect to the Schedule II medications prescribed to Mary Ann Hamilton and James Hamilton, DAVIS admitted to prescribing medications to his in-laws and acknowledged that the prescribing was inappropriate. DAVIS further admitted the oxycodone he prescribed to Mary Ann Hamilton, which he said was for chronic back pain, was excessive.

51.     SA Rogers asked DAVIS specifically about the prescription for 50 oxycodone issued/authorized by DAVIS to James Hamilton on May 11, 2020, which was filled by Mary Ann Hamilton. DAVIS advised that after Mary Ann Hamilton picked the prescription up from CVS, she delivered the medication to DAVIS for his personal ingestion.  DAVIS stated that Mary Ann Hamilton provided him approximately 40 tablets and she kept the remaining 10.

52.     SA Rogers asked DAVIS whether James Hamilton was aware that the Schedule II substances DAVIS prescribed to him were being diverted back to DAVIS for his personal ingestion. DAVIS said that James Hamilton was not aware of the prescribed medications. DAVIS further admitted that he began prescribing oxycodone to James Hamilton after Mr. Hamilton's oncologist discontinued that medication.

53.     SA Rogers asked where DAVIS maintains patient files. DAVIS advised SA Rogers that he maintains files through Carilion's electronic medical record provider EPIC, but also advised he keeps some files at his house. Specifically, with respect to Mary Ann and James Hamilton, DAVIS advised he kept a file for them both through EPIC and at his home. DAVIS stated he keeps files for people he treats outside of Carilion at his residence and separate from EPIC.

14

54.     During the interview, DAVIS mentioned that he collects medications for use through a non-profit, Roanoke Valley Medical Missions, for which DAVIS is listed as the President. DAVIS stated most medications were in a locked cabinet and do not include controlled substances.

55.     Prior to concluding the interview, SA Rogers asked if DAVIS currently had any Schedule II medication in his possession that had not been prescribed to him. DAVIS relinquished custody of 6 suspected 10mg oxycodone tablets, which were in DAVIS' vehicle. DAVIS advised SA Rogers that he had obtained the 6 tablets from a patient earlier in the week. DAVIS stated he was trying to decrease the quantity of medication being taken by this patient.

INTERVIEW OF PATIENT C ON MAY 26, 2020

56.     On May 26, 2020, your Affiant and SA Rogers conducted an interview of Patient C at his/her residence in Roanoke, Virginia. The following information was stated in substance and is not verbatim, and is intended to be a summary.

57.     Patient C explained that DAVIS had been at his/her residence on May 21, 2020, and that DAVIS had asked to see the medication DAVIS had previously prescribed. Patient C explained that during prior office appointments and home visits, DAVIS had conducted pill counts on his/her prescriptions. Patient C stated that DAVIS often took a majority of his/her prescribed medications, such as oxycodone, and would give four to six pills of the oxycodone back to Patient C in a bottle to keep. On May 21, 2020, Patient C stated he/she had hidden his/her medication so that DAVIS could not take any.

58.     DAVIS' visit to Patient C on May 21, 2020, was the third home visit he conducted. Patient C estimated that he/she started seeing DAVIS in approximately November 2019 due to a wound that had not healed properly. DAVIS asked Patient C to bring his/her prescription

15

medication to follow-up appointments. Once, Patient C forgot to bring the medication to his/her appointment and DAVIS became angry that he/she had not brought the medication.

59.    Patient C believes DAVIS has taken oxycodone and tramadol from him/her during prior appointments.  Patient C related that he/she hid his/her medication in an attempt to limit DAVIS' ability to take it.  Patient C explained that DAVIS often changed the dosage of his/her oxycodone medication and estimated that he/she had been prescribed oxycodone 5mg, 10mg, and 15mg.  Patient C stated that an employee at the CVS near Plantation Road in Roanoke, Virginia, commented to Patient C that his/her physician (DAVIS) was trying to drug him/her.  Patient C recalled the conversation taking place after Patient C submitted prescriptions for oxycodone and fentanyl for the pharmacy to fill.  Patient C stated that he/she was afraid to use the fentanyl after the employee's comment.

60.    Patient C explained that DAVIS had provided him/her with Wellbutrin for smoking cessation on a previous office visit. Patient C stated that DAVIS had taken the medication back during the May 21, 2020, home visit.

61.    Patient C recalled seeing DAVIS place his/her medication in his briefcase and in his pocket during office visits.

62.    Patient C stated that a nurse had informed him/her that DAVIS had become irritable and began to argue with other medical staff.  Patient C stated he/she noticed DAVIS' demeanor changed after the first few visits to see him.  Patient C explained that the change occurred around the same time as the conversation he/she had with the nurse.

63.    Patient C stated that DAVIS was scheduled to return to his/her residence for a subsequent home visit within the next week, at which time he planned to lance Patient C's wound.

16

Patient C said that DAVIS had previously performed the procedure in the office but had informed Patient C that he would bring the necessary equipment to her residence.

SEARCH OF DAVIS' RESIDENCE

64.    A search warrant for DAVIS' residence, 119 23rd Street SE, Roanoke, Virginia, was issued on Friday, May 29, 2020. Your Affiant participated in the execution of that search warrant on June 1, 2020.

65.    At approximately 11:00 AM on June 1, 2020, DEA agents arrived at DAVIS' residence to facilitate the execution of the search warrant. DAVIS met your Affiant at the front porch of the house and was informed of the search warrant and what agents would be searching for, specifically, controlled substances and patient files which DAVIS previously admitted were maintained at his residence. Prior to entering the residence, DAVIS inquired if pointing out where items were located within the residence would expedite the time that agents spent at DAVIS' home.

66.    Once the residence was cleared by agents and initial photographs were taken, DAVIS pointed your Affiant to an HP laptop computer located on a desk in an office, one room to the left of the front foyer. DAVIS accessed his Google account, benjamincamerondavis@gmail.com, and explained that any patient-related documentation that would be found in the home was maintained on a Google Drive folder stored though DAVIS' account. DAVIS left the computer unlocked and the Google account signed in. After consulting with his counsel, DAVIS consented to providing law enforcement with patient files stored on Google Drive, contained within his Google account.

17

67. TFO Jackson utilized a DEA-provided USB device to transfer the files and store them. However, TFO Jackson was only able to do so by printing each file as an XPS document. Metadata, which is present and maintained within Google Drive, and which would show when the documents were created and/or changes made, was not obtained with the transfer of files.

68. Additionally, from your Affiant's observation of DAVIS' open Google account, and the folder names contained therein, there appeared to be folders on Google Drive that contain additional medical records relevant to DAVIS' practice that were not transferred on June 1, 2020 during execution of the search warrant.

69. Your Affiant sent a preservation request concerning the subject account described in Attachment A to Google on Monday, June 1, 2020, prior to the conclusion of the search of DAVIS' residence.

PATIENT FILES CONTAINED ON DAVIS' GOOGLE DRIVE

70. On June 2, 2020, your Affiant reviewed the 23 documents transferred from DAVIS' Google Drive by consent during the search warrant. The files contain medical histories, notes, referrals and general medical-related correspondence. Some of the documents appear to be letters written by DAVIS on Carilion Clinic letterhead. Others, such as a file named "JS 972160," states "Clinical Ethics Consult Service" for patient J.S. at the top of the document and is signed "Clinical ethics team: Benjamin Davis, Mark Swope."

71. Among the 23 files, there are two concerning James Hamilton. One contains notes documenting Mr. Hamilton's medical history dating back to 2016. The other appears to be correspondence to an ambulance service from James Hamilton. There do not appear to be any

documents concerning Mary Ann Hamilton among the 23 files transferred during the search warrant execution.

72.     Your Affiant knows from training and experience that physicians often work from their residences to finalize patient notes and other medical-related documentation. During his May 21, 2020 interview, DAVIS admitted that he documents and maintains patient records at his residence for treatment he provides outside of his responsibilities as a physician employed by Carilion Clinic. DAVIS related he typically created these records outside of Carilion's EPIC electronic medical records system. Your Affiant knows that Carilion facilitates a physician's ability to access EPIC remotely and complete documentation outside of the office setting.

## GOOGLE, LLC

73.     Google, LLC provides a variety of online services, including electronic mail ("email") access to the public. Google allows subscribers to obtain email accounts at the domain name @gmail.com, like the email account listed in Attachment A. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. The computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

74.     In general, providers like Google ask each of their subscribers to provide certain personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, e-mail

19

addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number). Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

75.      In some cases, account users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

76.      Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides, (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit. Users can set up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Google

20

Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes to documents edited in Google productivity applications. Google preserves files stored in Google Drive indefinitely, unless the user deletes them.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

77.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

78.     Based on the forgoing, I request that the Court issue the proposed search warrant.

79.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

80.     The government will execute this warrant by serving the warrant on Google. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

David S. Clements
Task Force Officer
Drug Enforcement Administration

Sworn and attested to telephonically.
Subscribed and sworn to before me on June 12 , 2020.

*Robert S. Ballou*

UNITED STATES MAGISTRATE JUDGE

22